16 MAG 965                     ORIGINAL

Approved: _____
          JORDAN ESTES
          Assistant United States Attorney

Before:   THE HONORABLE FRANK MAAS
          United States Magistrate Judge
          Southern District of New York

U.S. DISTRICT COURT
FILED

FEB 10 2016

S.D. OF N.Y.

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :      COMPLAINT   DOC #___
                                  :
     - v. -                       :      Violation of
                                  :      21 U.S.C. § 846
                                  :
CARLOS RIVERA,                    :
JORGE TRUJILLO,                   :      COUNTY OF OFFENSE:
ELIEZER VIZCARRANDO, and          :      BRONX
EDWIN ACOSTA,                     :
                                  :
                    Defendants.   :
                                  :
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

          MICHAEL DEALMEIDA, being duly sworn, deposes and says that
he is a Detective with the New York City Police Department ("NYPD")
and charges as follows:

**COUNT ONE**
(Narcotics Conspiracy)

          1.    From at least in or about December 2015, up to and including
in or about February 2016, in the Southern District of New York and
elsewhere, CARLOS RIVERA, JORGE TRUJILLO, ELIEZER VIZCARRANDO, and
EDWIN ACOSTA, the defendants, and others known and unknown,
intentionally and knowingly did combine, conspire, confederate and
agree together and with each other to violate the narcotics laws of
the United States.

          2.    It was a part and an object of the conspiracy that CARLOS
RIVERA, JORGE TRUJILLO, ELIEZER VIZCARRANDO, and EDWIN ACOSTA, the
defendants, and others known and unknown, would and did distribute
and possess with intent to distribute a controlled substance, in
violation of Title 21, United States Code, Section 841(a)(1).

3.   The controlled substance that CARLOS RIVERA, JORGE TRUJILLO, ELIEZER VIZCARRANDO, and EDWIN ACOSTA, the defendants, conspired to distribute and possess with the intent to distribute was one kilogram and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charges are, in substance and in part, as follows:

4.   I have been a Detective with the NYPD for fourteen years. For the past three years I have been assigned to the federal Border Enforcement Security Task Force.  I am assigned to investigate violations of narcotics laws of the United States, and I have received training regarding these cases.  I have participated in numerous investigations related to illegal drug trafficking as well as methods used to finance drug transactions and launder drug proceeds and, among other things, have conducted or participated in surveillances, the execution of search warrants, and reviews of recorded conversations.  I am familiar with the facts and circumstances of this investigation from my personal participation in this investigation and reports made to me by other law enforcement authorities.

5.   I have participated in the investigation of this matter, and I am familiar with the information contained in this Complaint based on my own personal participation in the investigation, my review of documents, conversations I have had with other law enforcement officers about this matter, and my training and experience.  Because this Complaint is being submitted for the limited purpose of establishing probable cause to arrest the defendant, I have not included the details of every aspect of the investigation.  Where actions, conversations and statements of others are related herein, they are related in substance and in part, except where otherwise indicated.

## The Investigation

6.   Since 2015, I and other Border Enforcement Security task force officers have been investigating a drug trafficking organization ("DTO") operating in the Bronx and Puerto Rico, among other locations.  Based on my participation in this investigation, and for the reasons described below, I believe that the DTO is involved in the shipment of cocaine from Puerto Rico to locations in the United States.

7.   As part of this investigation, I and other law enforcement officers have debriefed a Confidential Source (the "CS").[1]   Based on those conversations, I have learned the following:

a.   The CS is an unlicensed cab driver.   On or about November 3, 2015, the CS picked up a co-conspirator not named herein ("CC-1") and members of the DTO who have yet to be identified from JFK Airport in Queens, New York.   During the car ride, the CS overheard CC-1 and the other individuals use coded language related to drug trafficking.   The CS offered to pick up the individuals the next time they flew into town.

b.   On or about December 15, 2015, the CS was contacted by a co-conspirator not named herein ("CC-2").   CC-2 instructed the CS to get the application "What's App" on the CS's cellphone.

c.   On or about December 17, 2015, the CS was instructed by CC-2, via What's App, to drive to a restaurant (the "Restaurant") in Boston.   When the CS arrived at the Restaurant, CC-2 directed the CS to drive to a storage facility in Boston (the "Boston Storage Facility").   At the Boston Storage Facility, the CS observed CC-1, a co-conspirator not named herein ("CC-3"), and an individual identified as ELIEZER VIZCARRANDO, the defendant, unloading packages from a unit in the storage facility.   CC-3 brought a package into the CS's vehicle ("Vehicle-1").   The CS observed CC-1 put a package in the vehicle CC-1 was driving ("Vehicle-2").   The CS also observed VIZCARRANDO put a package in the U-Haul truck VIZCARRANDO was driving.   The CS then drove CC-3 back to New York in Vehicle-1. According to the CS, CC-1 followed the CS and CC-3 to New York in Vehicle-2.

8.   On or about December 17, 2015, law enforcement agents conducted a car stop of Vehicle-1 in the Bronx, New York.   As part of that car stop, law enforcement agents recovered 50 kilograms of cocaine.   The cocaine was contained in a cardboard box covered in plastic wrap.   CC-3 was arrested in connection with the car stop.

9.   Also on or about December 17, 2015, law enforcement agents conducted a car stop of Vehicle-2 in the Bronx, New York.   As part of that car stop, law enforcement agents recovered 12 kilograms of

---

[1] Since in or about 2007, the CS has provided information to law enforcement.   The CS has received compensation in exchange for providing information to law enforcement.   The CS's information has proved accurate and reliable.

cocaine. The cocaine was contained in a box, and a picture on the box depicted medical equipment. CC-1 was arrested in connection with the car stop.

10. I and other law enforcement officers have spoken with DHL employees and reviewed DHL records. Based on those conversations and review of those records, I have learned the following:

a. On or about December 9, 2015, a package ("Package-1") was shipped from Puerto Rico by CC-1, on behalf of a company called "Puerto Rico Hosp Supplies," to CC-3 in Boston, Massachusetts. Package-1 was labeled "medical supplies." After a later review of the shipment of Package-1, it was determined to be suspicious by DHL because: (1) the shipper overpaid for the shipping; (2) the shipper paid in cash; and (3) Package-1 was overweight for the type of shipping used. In addition, Package-1 was dropped off late at night for overnight shipping. Based on my training and experience, and my involvement in this investigation, I believe that Package-1 contained illegal narcotics and was dropped off late at night to avoid detection.

b. On or about December 10, 2015, CC-3 picked up Package-1 from a DHL facility in Boston, Massachusetts.

c. On or about February 3, 2016, a package ("Package-2") was shipped from Puerto Rico by a co-conspirator not named herein ("CC-4"), on behalf of a company called "PR Hospital Supplies," to CARLOS RIVERA, the defendant. The address listed on Package-2 was a storage facility located in Bensalem, Pennsylvania (the "Bensalem Storage Facility"). Package-2 consisted of a three-foot by three-foot cube, made up of one-half inch thick plywood. Package-2 was sealed with screws and wrapped in plastic. Like Package-1, Package-2 was labeled "medical supplies." Package-2 was flagged as suspicious by DHL because: (1) the shipper overpaid for the shipping; (2) the shipper paid in cash; and (3) Package-2 was overweight for the type of shipping used. In addition, Package-2 was dropped off late at night for overnight shipping.

d. On or about February 8, 2016, a package ("Package-3") was shipped from Puerto Rico by CC-4, on behalf of "PR Hospital Supplies," to RIVERA. The address listed on Package-3 was the Bensalem Storage Facility. Package-3 was flagged as suspicious by DHL because: (1) the shipper overpaid for the shipping; (2) the shipper paid in cash; and (3) Package-3 was overweight for the type of shipping used. In addition, Package-3 was dropped off late at night for overnight shipping.

-4-

11.  On or about February 4, 2016, a drug dog sniffed the outside of Package-2 after it arrived at a DHL facility in Philadelphia, Pennsylvania (the "Philadelphia DHL Facility").  The results were negative.

12.  On or about February 4, 2016, I and other law enforcement agents conducted surveillance in the vicinity of the Philadelphia DHL Facility.  I and other law enforcement agents observed two individuals, later identified as CARLOS RIVERA and JORGE TRUJILLO, the defendants, arrive at the Philadelphia DHL facility to pick up Package-2.  Based on my conversations with DHL employees, I know that RIVERA and TRUJILLO were told that Package-2 had already been put in a delivery truck that was headed to the Bensalem Storage Facility.

13.  On or about February 4, 2016, at approximately 12:00 p.m., I and other law enforcement agents conducted surveillance of the Bensalem Storage Facility.  I and other law enforcement agents observed: (1) the DHL delivery truck enter the parking lot of the Bensalem Storage Facility, and (2) an Uncle Bob's moving truck enter the parking lot of the Bensalem Storage Facility.  I and other law enforcement agents observed CARLOS RIVERA and JORGE TRUJILLO, the defendants, take Package-2 from the DHL delivery truck and put it into the Uncle Bob's moving truck.  RIVERA and TRUJILLO drove up to a specific storage container within the Bensalem Storage Facility. RIVERA and TRUJILLO opened Package-2 and put smaller items from Package-2 inside a unit in the Bensalem Storage Facility (the "Unit").

14.  I and other law enforcement agents have spoken to the manager of the Bensalem Storage Facility and reviewed records from the Bensalem Storage Facility.  Based on those conversations and review of those records, I have learned the following:

    a.  JORGE TRUJILLO, the defendant, rented the Unit.

    b.  The rental agreement for the Unit states, in sum and substance, that the Unit will be used to store office equipment.

    c.  TRUJILLO told the manager of the Bensalem Storage Facility, in sum and substance, that he intended to use the Unit to store office equipment.

15.  On or about February 8, 2016, law enforcement agents obtained an anticipatory search warrant in the Eastern District of Pennsylvania to search Package-3 if: (1) Package-3 arrived in

Pennsylvania and (2) a drug dog indicated that Package-3 contained a controlled substance.

16.  On or about February 9, 2016, I and other law enforcement agents arranged for a drug dog to sniff Package-3 after it arrived in Pennsylvania.  The drug dog detected a controlled substance in Package-3.

17.  Shortly thereafter, I and other law enforcement agents executed the anticipatory search warrant on Package-3.  Package-3 contained medical equipment and brown cardboard boxes in various sizes.  During the search of Package-3 and the boxes contained therein, law enforcement agents located and seized approximately 115 brick-sized packages, weighing approximately 138 kilograms, containing powdery substances.  The powdery substance contained in one brick-sized package was later field tested for the presence of narcotics and tested positive for the presence of cocaine.

18.  I and other law enforcement agents replaced the brick-sized packages in Package-3 with similarly appearing brick-sized packages that contained sham narcotics.  Package-3 was then re-sealed and sent back out for delivery.

19.  On or about February 9, 2016, I and other law enforcement agents conducted surveillance in the vicinity of the Philadelphia DHL Facility.  At approximately 11:45 a.m., I observed CARLOS RIVERA and JORGE TRUJILLO, the defendants, pick up Package-3 in a white minivan ("Vehicle-3").  Package-3 was delivered to the area near Vehicle-3 by forklift.  I observed RIVERA and TRUJILLO break down Package-3 and put the contents of Package-3 into Vehicle-3.

20.  I and other law enforcement agents observed Vehicle-3 drive to a storage facility in the vicinity of Lindbergh Boulevard in Philadelphia, Pennsylvania (the "Philadelphia Storage Facility").  I observed JORGE TRUJILLO and CARLOS RIVERA, the defendants, remove the contents of Vehicle-3 and take them into a door of the Philadelphia Storage Facility (the "Door"), which provided access to multiple storage units.  I observed TRUJILLO and RIVERA return to Vehicle-3 and depart the Philadelphia Storage Facility.

21.  Shortly thereafter, I and other law enforcement officers observed a maroon Sport Utility Vehicle ("Vehicle-4") drive into the Philadelphia Storage Facility.  I observed ELIEZER VIZCARRANDO, the defendant, exit the passenger side of Vehicle-4 and enter the Door with a backpack.  Shortly thereafter, I observed VIZCARRANDO exit

the Door with the backpack and place the backpack into Vehicle-4. VIZCARRANDO then entered the passenger side of Vehicle-4, and Vehicle-4 departed from the Philadelphia Storage Facility.

22.  I have spoken with other law enforcement agents who followed Vehicle-4 after it departed the Philadelphia Storage Facility.  They observed Vehicle-4 travel through the Bronx, New York.  At approximately 3:25 p.m., law enforcement agents stopped Vehicle-4 in the vicinity of Greenwich, Connecticut.  EDWIN ACOSTA, the defendant, was in the driver's seat of Vehicle-4, and ELIEZER VIZCARRANDO, the defendant, was in the passenger seat.  Brick-sized packages containing sham narcotics were found inside a trap in Vehicle-4.  The law enforcement agents placed ACOSTA and VIZCARRANDO under arrest.

23.  On or about February 9, 2016, at approximately 3:20 p.m., I and other law enforcement agents arrested CARLOS RIVERA and JORGE TRUJILLO, the defendants, read them their Miranda rights, and interviewed them separately.

24.  During his interview, CARLOS RIVERA, the defendant, stated, in sum and substance, the following:

a.  RIVERA was approached by a co-conspirator not named herein ("CC-5") about an opportunity to make money by assisting in shipping boxes to the East Coast.

b.  CC-5 instructed RIVERA to travel to the East Coast, obtain a rental car, and lease two particular storage facilities. CC-5 gave RIVERA instructions regarding the packages he was supposed to pick up, and RIVERA followed those instructions.

c.  RIVERA understood that the initial shipment of Package-2 would be a test run, and that the later shipment of Package-3 would contain narcotics.

d.  On February 9, 2016, ELIEZER VIZCARRANDO, the defendant, called RIVERA and told RIVERA that VIZCARRANDO would come meet RIVERA to look at the narcotics that arrived in Package-3.

25. During his interview, JORGE TRUJILLO, the defendant, stated, in sum and substance, the following:

a.  TRUJILLO was approached by CC-5 about an opportunity to make money.  CC-5 instructed TRUJILLO to travel to the East Coast and open two storage facilities in New Jersey, and two storage

facilities in Pennsylvania.

        b.   TRUJILLO understood that Package-2 had been sent to see how law enforcement would react.

        c.   TRUJILLO understood that the contents of Package-3 included illegal narcotics.

    26. On or about February 9, 2016, at approximately 10:30 p.m., I interviewed ELIEZER VIZCARRANDO, the defendant, after reading him his Miranda rights.  VIZCARRANDO stated, in sum and substance, that an individual in Puerto Rico ("Individual-1") instructed him to go to the Philadelphia Storage Facility and take a particular box of narcotics from that location. Individual-1 instructed VIZCARRANDO to take the narcotics to Chicopee, Massachusetts, to distribute.

    27. I have spoken to another law enforcement agent who interviewed EDWIN ACOSTA, the defendant, at approximately 10:30 p.m., after reading him his Miranda rights.  Based on that conversation, I know that ACOSTA stated, in sum and substance:

        a.   ACOSTA owns Vehicle-4, which contains a trap.

        b.   In or about February 2016, ELIEZER VIZCARRANDO, the defendant, contacted ACOSTA about an opportunity for ACOSTA to make money by transporting VIZCARRANDO in Vehicle-4.  ACOSTA understood that VIZCARRANDO needed a ride from ACOSTA so that VIZCARRANDO could transport narcotics in the trap of Vehicle-4.

-8-

WHEREFORE, deponent respectfully requests that CARLOS RIVERA, JORGE TRUJILLO, ELIEZER VIZCARRANDO, and EDWIN ACOSTA, the defendants, be imprisoned or bailed, as the case may be.

_____
MICHAEL DEALMEIDA
Detective
New York City Police Department

Sworn to before me this
10th day of February, 2016

_____
THE HONORABLE FRANK MAAS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

-9-